UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JON REED, et al.,<br><br>   Plaintiffs,<br><br>  v.<br><br>CITY OF EMERYVILLE, et al.,<br><br>   Defendants. | Case No. 21-cv-02781-WHO<br><br>**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: Dkt. Nos. 8, 10 |

Plaintiffs Jon Reed, Laura Berry, Frank Eugene Moore III, and Gabriel Smithson are homeless individuals who currently reside at the Ashby/Shellmound encampment (Encampment), located at 6701 Shellmound Street, Emeryville, California. Complaint ¶ 1. Where Do We Go Berkeley (WDWG) is a 501(c)(3) organization made up of homeless and housing insecure individuals and advocates that provides services for residents of the Ashby/Shellmound Encampment.[1] *Id*. ¶ 17. They bring this suit to enjoin defendants – the City of Emeryville, Emeryville Mayor Dianne Martinez, and City Manager Christine Daniel – from closing the Ashby/Shellmound Encampment.[2]

On April 18, 2021, plaintiffs sought and on April 19, 2021 obtained a Temporary Restraining Order (TRO) that prohibited the defendants "from proceeding with the removal of persons and personal belongings and structures from the Emeryville Ashby/Shellmound located

---

[1] WDWG Berkeley's mission is to serve, support and advocate for homeless individuals living in the East Bay. WDWG's main focus is to represent, support, and serve the four largest encampments along the I-80 corridor –in Berkeley and Emeryville, California. The Ashby/Shellmound encampment is one of these four encampments. *Id*.

[2] Plaintiffs allege that approximately 40-50 homeless persons have been encamped, fed, and provided with critical basic necessities, services, medical support, and resources at the Encampment for over two years. *Id*. ¶ 1. Defendants contend that there are only four to five individuals currently living there. Declaration of Chadrick Smalley, Dkt. No. 23, ¶ 3.

near 6701 Shellmound Street, closing the Emeryville Ashby/Shellmound located near 6701 Shellmound Street, and/or otherwise removing homeless persons from said locations unless and until each person is actually provided—in real-time—with safe, indoor individual private housing, consistent with CDC guidelines." Dkt. No. 10. The TRO required the City to show cause why a preliminary injunction should not issue on an expedited briefing schedule.

After further briefing and oral argument, I find that the plaintiffs are not entitled to the preliminary injunction they seek. The City has a demonstrated need to clear the Encampment to protect public safety – both that of the Encampment residents and people passing by the site – during the long-planned and ongoing construction of housing and associated public works projects at the site. This is not a situation where the City is attempting to clear an encampment for purely aesthetic or sham-public health reasons. The City has given reasonable notice – and is mandated to give more as detailed below – of both its plan to clear the Encampment and how it will collect, store, and make accessible any personal property left at the Encampment. The City has also offered – and is mandated to provide for current Encampment residents who want it – transportation to and provision of a guaranteed nighttime shelter bed at a shelter that is complying with reasonable COVID-19 protocols.

The plaintiffs understandably balk at staying in a congregate shelter. Some of them state that they have mental health conditions that make staying in a shelter uncomfortable or untenable. But absent statutory or constitutional authority requiring otherwise, the provision of a guaranteed shelter bed, transportation, and storage of personal property is all that can be mandated on this record.

I recognize that the Center for Disease Controls' current advice is that, in light of the risk of COVID-19, communities should consider allowing people who are living unsheltered or in encampments to remain where they are. "Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread."[3] I have weighed that guidance carefully. But because the

---

[3] *See* <https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html#facility-encampments>.

2

City has demonstrated a legitimate need to remove the four to five individuals living at the Encampment and given the availability of the COVID-19 vaccine, the current the downward trend in Alameda County of COVID cases, and the efforts that St. Vincent de Paul's shelter is taking to mitigate COVID (including checking temperatures, mandating masks, and testing), the CDC guidance does not require the injunction plaintiffs seek. Allowing the clearing of the Encampment and displacing the four or five residents while requiring the City to provide a guaranteed overnight shelter bed under the current conditions does not implicate the "state-created" dangers doctrine relied on by plaintiffs. If conditions materially change due to a surge in COVID, if conditions materially change at St. Vincent de Paul (due to evidence of inadequate COVID protocols), or if the City fails to comply with my directions (identified below), plaintiffs may again seek expedited relief.

**BACKGROUND**

**I.  PLAINTIFFS AND THE ASHBY/SHELLMOUND ENCAMPMENT**

Homeless people have been living at the Ashby/Shellmound encampment (Encampment) for at least two years. Declaration of Andrea Henson, Dkt. No. 25-1, ¶ 2. The Encampment currently consists of approximately four to five individuals. Declaration of Chadrick Smalley, Dkt. No. 23, ¶ 3.

Plaintiff Jon Reed has been diagnosed with Post Traumatic Stress Disorder, has been homeless for 12 years, and currently lives at the Encampment. Declaration of Jon Reed, Dkt. No. 8-2, ¶¶ 3, 4, 8. He does not state when he received notice of the clearing of the Encampment, but states that "[n]o service provider has offered me a place where I legally stay since the notices to evict were posted," he has no means to move his property, and he fears he will get COVID-19 and spread it to others if he is evicted. *Id.* ¶¶ 13, 14, 17. Reed declares that he "cannot enter St. Vincent DePaul shelter because they will not accept all of my belongings. Residents are only allowed to bring one bag. I would have to leave during the day and I cannot survive with only one bag of my belongings during the day. I also have PTSD, and I cannot be in a shelter with that many people and no privacy. It would trigger my PTSD." Reply Declaration of Jon Reed, Dkt. No. 25-6, ¶¶ 9-10.

3

Plaintiff Laura Berry has been homeless for eight years and currently resides at the Encampment. Declaration of Laura Lee Berry, Dkt. No. 8-4, ¶¶ 3, 6, 7. She does not declare when she learned of the clearing of the Encampment, but states that "no service provider has offered me a place where I can legally stay since the notices to evict were posted," and that she has no cellphone charger and no means to move or store any of her property. *Id*. ¶¶ 11-13. She states that she "cannot move into St. Vincent de Paul because of its instability and lack of permanence," because she would be "forced to abandon all of my belongings" as St. Vincent de Paul only allows her to keep two personal items with her and she would have to live on the street during the day, and because she would "be too scared and anxious sleeping in a congregate setting like that." Reply Declaration of Laura Berry, Dkt. No. 25-7, ¶¶ 8-10.

Plaintiff Frank Eugene Moore, III has been diagnosed with Paranoid Schizophrenia, has been homeless for five years, and currently lives at the Encampment. Declaration of Frank Eugene Moore, III, Dkt. No. 8-3, ¶¶ 3, 7, 8. He does not state when he received notice of the clearing of the Encampment but states that "[n]o service provider has offered me a place where I [can] legally stay since the notices to evict were posted" and that he has no way to move his property. *Id*. ¶¶ 13-15. He is worried about contracting COVID-19 if he is evicted. *Id*. ¶ 18. He has never stayed in a shelter but declares due to his paranoid schizophrenia that he would "not be okay in a shelter with a bunch of strangers and no privacy," and he would not feel safe. *See* Reply Declaration of Frank Moore III, Dkt. No. 25-2, ¶¶ 4-5.

Plaintiff Gabriel Smithson has been homeless for two and a half years, currently lives at the Encampment, has a compromised immune system, and does not believe she could protect herself from COVID-19 if she was evicted. Declaration of Gabriel Smithson, Dkt. No. 8-5 ¶¶ 4, 8, 17. She does not say when she learned of the clearing of the Encampment but does say that no service provider has offered her "a place where I [can] legally stay since the notices to evict were posted" and that she has not means to move her property, including some property that cannot be moved because it is built in place. *Id*. ¶¶ 13, 14. She declares she has "never been able to handle a shelter even for one night as I suffer from severe anxiety in crowds ever since high school," and that given her compromised immunity system (diagnosed as Crones disease and Lupus), she feels

4

being in a congregate setting would not be safe for my health." Reply Declaration of Gabriel Smithson, Dkt. No. 25-3, ¶ 11.

## II. CONSTRUCTION ABUTTING THE ENCAMPMENT

In 2016, the City's Planning Commission approved a large-scale housing unit (including eight units for households earning up to 50% of the area's median income) to be built at a site abutting what is now the Ashby/Shellmound Encampment. Declaration of Charles S. Bryant, Dkt. No. 19, ¶ 5. Declaration of Stephen Clarke, Dkt. No. 21, ¶ 4. The site is currently an active construction site and all necessary permits are in place, including permits allowing the developer to construct fencing around the area currently encompassing the Encampment to perform necessary traffic control measures in conjunction with the construction. Bryant Decl. ¶¶ 5-6; Clarke Decl. ¶¶ 4-6. Until the Encampment is cleared, the developer cannot comply with the required Conditions of Approval, including putting a second access route into the site that is necessary for construction and emergency vehicles, placing fencing to encompass construction materials and debris, and grading on the encampment site itself. Bryant Decl. ¶¶ 7-8; Clarke Decl. ¶¶ 6-9. Delays not only impact the construction of the project itself, but also Emeryville's Railroad Quiet Zone Safety Improvements capital improvement project. Clarke Decl. ¶ 9.

## III. OUTREACH BY EMERYVILLE AND NOTICE OF CONSTRUCTION

In 2015 and 2018, the City adopted and then updated the City of Emeryville Homeless Strategy ("Homeless Strategy"). Declaration of Christine Daniel, Dkt. No. 22, ¶¶ 5-6. As part of its Strategy in 2018, the City entered into memoranda of understanding with the City of Oakland to provide shelter for unhoused individuals and families from Emeryville; in 2020 the City contracted with Operation Dignity, Inc. to provide homeless outreach and housing navigation team services. *Id*. ¶¶ 6-7. The City declares that because of the planned construction, in October 2020 the City started distributing notices explaining the upcoming construction and outreach workers at Operation Dignity "began concerted, personal outreach efforts in order to encourage those residing at the Shellmound Encampment to voluntarily relocate in advance of the anticipated construction." *Id*. ¶ 8; *see also* Smalley Decl. ¶ 12 (Operation Dignity notes reflect Reed received notice of construction and relocation and received guidance on steps to secure more permanent housing in

5

October 2020, January 2021, February 2021, and March 2021).

On April 5, 2021, the outreach team at Operation Dignity posted and distributed notices at the Encampment providing an "update" on the construction, and on April 13, 2021, the outreach team at Operation Dignity posted and distributed notices that the City intended to close the Encampment and dispose of materials left after April 19, 2021 at 10:30 a.m. Daniel Decl. ¶¶ 9-10; Smalley Decl. ¶ 16. From April 14 through April 19, the City had twenty-five beds reserved at St. Vincent de Paul for any individual from the Encampment. *Id*. ¶ 10. The City attests that Operation Dignity has "continued its outreach efforts" at the Encampment and continues to reserve spaces at St. Vincent de Paul's for Encampment residents who want to relocate there. *Id*. ¶ 13. The City declares that St. Vincent de Paul has implemented protocols in light of the COVID-19 pandemic, including daily temperature checks, social and physical distancing, cleaning, mask adherence, and COVID testing twice a month during lunch service and once a month during overnight shelter hours. Smalley Decl. ¶ 19.

The City, through the declaration of Chadrick Smalley (the Economic Development and Housing Manager for the City whose staff oversees the City's contract with Operation Dignity), attests that Operation Dignity has had a number of contacts at the Encampment with each of the plaintiffs in this case. Smalley Decl. ¶¶ 1, 9. Operation Dignity is contracted to provide "in-field engagement" of homeless people in the City, including provision of food, hygiene kits, and other tangible offerings and offering transportation to appointments and supportive services to make individuals housing ready, as well as performing outreach to local landlords, housing navigation, and case management services to assist homeless persons in securing longer-term housing. *Id*. ¶ 10. In his declaration, Smalley describes – based on notes from Operation Dignity service providers – what notice, services, and explanation of services were provided to each of the named plaintiffs between October 2020 and April 2021. Smalley Decl. ¶¶ 12-15.

Some of the plaintiffs admit that they had contact with Operation Dignity, but criticize the organization for not following through, missing scheduled appointments, not returning calls, and promising spaces in "small cabin" housing but not providing it. *See* Reply Declaration of Frank Moore III, Dkt. No. 25-2, ¶ 2; Reply Declaration of Gabriel Smithson, Dkt. No. 25-3, ¶¶ 2-3;

1 Reply Declaration of Jon Reed, Dkt. No. 25-6, ¶ 2, 6-8. Plaintiffs dispute whether adequate notice was provided of the planned April 19, 2021 clearing of the Encampment, although the named plaintiffs do not state when they received notice of the planned April 19, 2021 clearing. However, the President of WDWG explains that "some residents" saw a confusing notice posted on April 5, 2021 and one unidentified resident first saw the notice on Thursday, April 15, 2021. *See* Declaration of Ian Cordova Morales Rogers (the President and Lead Organizer of WDWG, Dkt. 8-6), ¶ 15 (explaining some residents saw a "construction notice" taped to a porta potty on April 5, 2021, but residents were unclear whether the notice was an eviction notice or was telling them they could stay and calls seeking clarification were not returned), ¶¶ 16, 19 (explaining that a resident at the Encampment saw the first clear notice about the eviction scheduled for Monday, April 19, 2021 taped around a sign pole posted "after hours on Thursday, April 15, 2021").

## IV. PROCEDURAL BACKGROUND

Plaintiffs filed this case on April 18, 2021, seeking a Temporary Restraining Order requiring the City "and all persons acting with them or under their control including law enforcement agencies" from removing "persons or property from the Ashby/Shellmound encampment located in Emeryville, California." Dkt. Nos. 1, 8. On April 19, 2021, the duty judge granted the TRO and set the matter for expedited briefing in support of a preliminary injunction. Dkt. No. 10. The matter was reassigned to me and on May 3, 2021, I held argument in support of plaintiffs' request for a preliminary injunction.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 65 governs preliminary injunctions. A preliminary injunction may be issued if a plaintiff establishes: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22. The Ninth Circuit has held that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two

7

elements of the *Winter* test are also met." *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

**DISCUSSION**

Plaintiffs argue that they are entitled to a preliminary injunction extending the TRO and further enjoining the City from clearing the Encampment because: (i) the City did not provide adequate notice of the clearing and removal or property and indicated that it would destroy plaintiffs' property in violation of plaintiffs' due process rights and (ii) by evicting plaintiffs from the encampment and placing them into a shelter or otherwise in the community, the City was "deliberately indifferent" to a "state-created" danger, namely putting the plaintiffs at risk of catching or spreading COVID-19 to the surrounding community. Dkt. No. 8.

**I. NOTICE**

Plaintiffs argued, in support of the TRO, that the notice provided to plaintiffs regarding the clearing of the Encampment was insufficient because notices prior to April 15, 2021 were vague or confusing and the April 15, 2021 notice did not give plaintiffs enough time to voluntarily vacate. They also argue that the April 15, 2021 notice informed plaintiffs only that their personal property – which they attest they are unable to move on their own – would be destroyed in violation of their due process rights. *See, e.g., Lavan v. City of Los Angeles*, 693 F.3d 1022, 1032 (9th Cir. 2012) ("Because homeless persons' unabandoned possessions are 'property' within the meaning of the Fourteenth Amendment, the City must comport with the requirements of the Fourteenth Amendment's due process clause if it wishes to take and destroy them.").

The alleged notice deficiencies and threated destruction of their personal property entitled plaintiffs to the TRO they secured. But now, even if I disregard the City's assertions regarding notice, plaintiffs have received constitutionally adequate notice of the City's intent to clear the Encampment. As for plaintiffs' personal property, I have required and continue to require that the City meet and confer with plaintiffs' counsel to come up with a constitutionally sufficient process for removing and storing plaintiffs' personal property for at least 90 days and to provide plaintiffs the ability to access that property during the time it is in storage. These protections satisfy plaintiffs' rights to due process.

8

## II. DELIBERATE INDIFFERENCE/STATE-CREATED DANGER

In light of the ongoing COVID-19 pandemic, as informed by the CDC guidance advising against clearing homeless encampments absent provision of shelter where individuals could isolate, plaintiffs also argued that clearing the Encampment and offering only a nighttime shelter bed in a congregate setting at St. Vincent de Paul's "exposes plaintiffs to the known dangers of street encampment living without sanitation and community violates plaintiffs' substantive due process rights." Mot. at 13-14 (citing *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006); *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 197, 201 (1989)).[4] Plaintiffs correctly note that courts have applied the "state-created danger" doctrine to prevent, for example, a city from demolishing an encampment at the onset of winter. *See, e.g.*, *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1093, 1102 (E.D. Cal. 2012) (enjoining city where defendants knew that plaintiff and others in plaintiff's position "had no alternative shelter or means of protection from the elements nor any other means of keeping their personal property safe, and that no safe shelter was available to plaintiff or to large numbers of other homeless residents"). They argue that deciding to evict plaintiffs and clear the Encampment during the COVID-19 pandemic means that the City is acting with deliberate indifference and placing these plaintiffs in significant danger from COVID-19.

Two judges in this District have addressed similar theories based on significantly different facts. In *Santa Cruz Homeless Union v. Bernal*, 20-CV-09425-SVK, 2021 WL 222005 (N.D. Cal. Jan. 20, 2021), the Hon. Susan Van Keulen enjoined the City of Santa Cruz from clearing homeless encampments where the evidence showed the "City's homeless shelters are full" and the move would "leave the homeless persons camping in those locales more vulnerable to COVID-19 than if they were allowed to remain in the encampments." *Id*. *1. She cautioned, however, that "the keystone of the preliminary injunction is the current dire state of the COVID-19 pandemic," as of January 2021, and "[a]s vaccines roll out and the pandemic eases, dispersal of homeless

---

[4] In *Kennedy*, the Ninth Circuit explained that state actors can be liable under this doctrine where government conduct "affirmatively place an individual in danger" and shows "deliberate indifference to a known or obvious danger in subjecting the plaintiff to it." *Kennedy*, 439 F.3d at 1062.

9

1 persons from the encampments may no longer put them at greater risk for COVID-19, and re-
2 evaluation of the injunction will be necessary." *Id*. Indeed, in April 2021, Judge Van Keulen
3 revisited the injunction and allowed Santa Cruz to relocate persons and their property to a different
4 encampment. *See* 20-CV-09425-SVK, 2021 WL 1256888 (N.D. Cal. Apr. 1, 2021).

In *Sausalito/Marin County Chapter of California Homeless Union v. City of Sausalito*, 21-CV-01143-EMC, 2021 WL 783571, at *1 (N.D. Cal. Mar. 1, 2021), the Hon. Edward M. Chen enjoined the City of Sausalito's "plan to break up" a homeless encampment, "move the campers to a different site, and impose a ban on day camping (which would require the campers to break camp each morning, store their equipment, and not set up camp again until the evening)." Plaintiffs alleged two forms of state-created danger: first, that the alternative overnight camping sign was not suitable because of toxic hazard; and second, that the day camping ban would require individuals to break camp in the morning and prevent them from setting up a new camp until the evening, placing the campers, as well as the public, at greater risk to COVID-19. *Id*. Judge Chen determined that the harm to plaintiffs (from forced mixing in the community during the day and having to store their property each day in congregate storage units, as well as the potential harm from toxic substances) outweighed the total lack of harm to the City from allowing the encampment to stay where it was located. *Id*. at *7. Also persuasive was the fact that "defendants have offered no good reason that justifies the ban on day camping" and the facts, "as presented thus far, strongly suggest that Defendants, in enacting this ban, have done so in spite of, not in furtherance of, public health" and there was a strong "inference that Defendants have not acted in the best interests of the campers in ordering the move." *Id*. at *9.

The facts here are materially different from the facts in those cases. First, there is a significant and established public safety need to clear the Encampment in light of the ongoing housing construction. Unlike the *Fresno*, *Santa Cruz*, and *Sausalito* cases – where there was no justification for clearing encampments or a thin and disputed "public health" defense made in support –given the location of the Encampment and the need to protect the residents' safety as well as passersby during the ongoing construction, Emeryville's concerns are supported and not contested by plaintiffs. Second, unlike the *Santa Cruz* and *Fresno* cases, shelter beds have been

10

guaranteed for *each* resident of the Encampment and provisions have been made (or will soon be agreed-to between the parties) for the transport and storage of plaintiffs' personal property. Third, the COVID-19 rates in Alameda County are trending downward, St. Vincent de Paul's has instituted social distancing and COVID-protection protocols, and the vaccine is available to plaintiffs (as noted below, I have ordered defendants to facilitate plaintiffs' receipt of the vaccine if they want it). The dispersement of the four or five current residents of the Encampment into the community at this point with this plan in place does not demonstrate deliberate indifference to a significant state-created danger.

In Reply, plaintiffs raise a different argument justifying immediate relief; that Reed, Smithson, and Moore are being discriminated against and/or denied appropriate services in light of their disabilities. Reply at 11-12; *see also* Complaint, Fourth Claim for Relief (alleging a Violation of Title II of the Americans with Disabilities Act (ADA) because plaintiffs are excluded from services provided by Operation Dignity). Plaintiffs argue that the ADA was violated when they were not provided with packing and transportation assistance. I have now required those services. *See infra*.

Plaintiffs also contend that being offered only one housing alternative – a shelter bed at St. Vincent de Paul's – violates that ADA because living in a congregate shelter may trigger Reed, Smithson, or Moore's disabilities. The only cases cited by plaintiffs to support this argument are cases that challenge municipal or county policies, however, not discrete decisions of those policies. *See McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (compliance with city's nuisance abatement ordinance); *Bloom v. City of San Diego,* No. 17-CV-2324-AJB-NLS, 2018 WL 9539238, at *3 (S.D. Cal. June 8, 2018) (challenging the disproportionate burden on disabled individuals from San Diego Municipal Codes making it unlawful to use a vehicle as a living quarters, and park RVs on city streets during the early morning); *Communities Actively Living Independent and Free v. City of L.A*., No. CV 09–0287 CBM (RZx), 2011 WL 4595993, at *2 (C.D. Cal. Feb. 10, 2011) (challenging the county's failure to include emergency relocation policies and plans for disabled individuals).

Plaintiffs' challenges to the services (or lack thereof) of Operation Dignity cannot, on this

record, support their Title II ADA claim sufficient for the injunctive relief they seek. That is not to say that after discovery plaintiffs may not be able to state or prove a claim under Title II of the ADA. That said, as noted below, I have required defendants to meet and confer with plaintiffs (through plaintiffs' counsel) about longer-term housing solutions appropriate for each of their individual situations and disabilities at least twice a month while this case is pending.

Plaintiffs have not, on this record, demonstrated a likelihood of success on the merits of their claims to justify a further injunction on the City's ability to clear the Encampment. Even if I were to consider the remaining preliminary injunction factors, now that the City is required to comply with plaintiffs' due process rights regarding notice and storage of their property (*see infra*), provide plaintiffs access to COVID-19 vaccination appointments (if plaintiffs want them), and provide transportation to a guaranteed shelter bed in a facility that mandates COVID-19 protocols, the balance of hardships and public interest both tip in favor of the City and in allowing the long-planned and active housing construction project to proceed in a safe manner without jeopardizing the health and safety of Encampment residents or the public more generally.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction prohibiting the defendants from clearing the Encampment is DENIED. However, the parties are required to do the following:

1. By May 14, 2021, plaintiffs shall notify the City through their counsel whether they will move and take their belongings to a different site, move and ask that the City store their personal property for 90 days, or go to the St. Vincent de Paul shelter where the City guarantees that they will have access to an overnight bed and have the City store their personal property for 90 days.

2. By May 21, 2021, absent other agreement with the City or further order of this Court, plaintiffs shall vacate the Ashby/Shellmound Encampment. The Temporary Restraining Order will be lifted as of 8:00 a.m. on May 22, 2021.

3. By May 10, 2021, the City shall provide written notice of both (1) the need to vacate the Ashby/Shellmound Encampment by May 22, 2021 (absent agreement of the City or further order of this Court) and (2) the procedures that the City will follow for any personal property that residents are unable to move or unable take with them when they vacate the encampment through counsel. Service of both Notices shall be through counsel to plaintiffs and by personal service on all active campsites at the Ashby/Shellmound Encampment by delivering a copy of the notice to each site as well as posting the Notices throughout the Encampment. The

12

    Property Storage Notice shall explain that the property will be stored for at least 90 days (other than trash or dangerous items), where it will be stored, and how residents may access it. The parties are to meet and confer to determine reasonable methods for accessing the stored personal property, for example setting up regular walk in hours each day, considering that plaintiffs do not have access to cellphones. The parties shall also meet and confer regarding how the City will provide assistance with packing the personal property for those who require it and shall explore the possibility of the City providing assistance relocating personal property to somewhere other than the City storage facility or St. Vincent de Paul's.

4. As soon as possible, the City shall facilitate COVID vaccinations for any plaintiff who has not received but wants to receive a COVID-19 vaccination or vaccinations by securing appointments and providing transportation for them.

5. For any plaintiff or other person at the encampment who chooses to be relocated to the St. Vincent de Paul shelter, the City shall provide transportation to the shelter at a time when the shelter is open and allowing entrance for residents.

6. The City shall make best efforts to locate long-term housing for plaintiffs, including meeting and conferring with plaintiffs' counsel at least twice a month regarding opportunities for each named plaintiff this case.

    If conditions materially change (*e.g.*, due to a surge in COVID), if conditions materially change at St. Vincent de Paul (*e.g.*, due to evidence that adequate COVID precautions are not being followed), or if the City fails to comply with my Orders, plaintiffs may again seek expedited relief. A status conference is set for **May 18, 2021**, at 2 p.m. If there are any issues that the parties need the Court to address, they shall submit a Joint Statement on May 17, 2021.

**IT IS SO ORDERED.**

Dated: May 6, 2021

                                              William H. Orrick
                                              United States District Judge