UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JON REED, et al.,

    Plaintiffs,

v.

CITY OF EMERYVILLE, et al.,

    Defendants.

Case No. 21-cv-02781-WHO

**ORDER ON MOTION TO DISMISS**

Re: Dkt. No. 44

Individual homeless plaintiffs Jon Reed, Laura Berry, Frank Eugene Moore, III, Gabriel Smithson, and organizational plaintiff Where Do We Go Berkeley ("WDWGB") bring this suit against the City of Emeryville (the "City") and Christine Daniel, the City Manager of Emeryville, alleging constitutional violations and violation of the American with Disabilities Act ("ADA") because defendants removed the individuals from their former encampment and failed to provide housing appropriate for their mental health disabilities. Defendants move to dismiss, arguing that the constitutional challenges are moot and that plaintiffs fail to adequately allege their ADA claim. I find that the claims are not moot and that WDWGB has standing. Plaintiffs cannot, however, plausibly allege their state-created danger claims because the defendants did not put them in a more dangerous situation than they had been in. Those claims are dismissed WITH PREJUDICE. The individual plaintiffs' allegations in support of their Title II ADA claim are plausible, however, and WDWGB's Title II claim is dismissed WITH LEAVE TO AMEND. At this juncture, I cannot determine whether the City has made reasonable accommodations to make its program to address homelessness accessible to disabled people.

**BACKGROUND**

In the First Amended Complaint ("FAC"), plaintiffs allege that the defendants and their contractor, Operation Dignity, "do not operate the City's homelessness program in a way that is

accessible to people with disabilities. As a result, people with severe mental and physical disabilities suffer outright exclusion from the program or are denied equal access to the benefits of the program, including case management, services, and permanent housing that appropriately accommodate their disabilities." FAC ¶¶ 27, 29, 36. Plaintiffs allege that the defendants know that plaintiffs Reed, Berry, Moore and Smithson are disabled and have failed to make reasonable modifications to the program it developed and operates through Operation Dignity. *Id*. ¶¶ 30-31.

In particular, plaintiffs assert that the only shelter option offered by the City of Emeryville, an overnight shelter at St. Vincent de Paul, is not suitable for persons with mental health disabilities. *Id*. ¶ 35. When the City cleared the individual plaintiffs' former encampment (the Shellmound Encampment, hereafter "Encampment"), the plaintiffs were not offered suitable accommodations for their disabilities and many were forced to repeatedly relocate to various encampments over a series of days. *Id*. ¶¶ 38-41. As a result of defendants' actions "forcing plaintiffs to move without housing that would accommodate their disabilities, plaintiffs felt isolated, traumatized, and destabilized, all of which triggered their mental health symptoms and caused them to feel extreme anxiety, stress, uncertainty, paranoia, and depression." *Id*. ¶¶ 42-47.

Based on these allegations, plaintiffs assert three causes of action: (i) State-Created Danger in Violation of Due Process Guaranteed by the Fourteenth Amendment to the United States Constitution under 42 U.S.C. § 1983 against all defendants; (ii) State-Created Danger in Violation of Due Process Guarantees under the California Constitution (Cal. Const. Art. I, §7) against all defendants; and (iii) Violation of the Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12132), against the City of Emeryville. Defendants move to dismiss under Rule 12(b)(1), arguing: (i) the first two claims are moot because in my rulings on plaintiffs' motion for a preliminary injunction I ordered that the individual plaintiffs to leave the Encampment and plaintiffs voluntarily left that Encampment and are not currently residing in Emeryville; and (ii) organizational plaintiff WDWGB has no standing to assert this claim on behalf of any other potential homeless person residing in Emeryville. The defendants also move to dismiss under Rule 12(b)(6), contending that no claim can be asserted against Daniel, the *Monell* claims are not sufficiently pleaded against Emeryville, and plaintiffs have otherwise failed to plead their

constitutional and ADA claims.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure is a challenge to the court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction," and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994). The party invoking the jurisdiction of the federal court bears the burden of establishing that the court has the authority to grant the relief requested. *Id*. A challenge pursuant to Rule 12(b)(1) may be facial or factual. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In a facial attack, the jurisdictional challenge is confined to the allegations pled in the complaint. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). The challenger asserts that the allegations in the complaint are insufficient "on their face" to invoke federal jurisdiction. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). To resolve this challenge, the court assumes that the allegations in the complaint are true and draws all reasonable inferences in favor of the party opposing dismissal. *Wolfe*, 392 F.3d at 362.

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss if a claim fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the claimant must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*. While courts do not require "heightened fact pleading of specifics," a claim must be supported by facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570. In deciding a motion to dismiss for failure to state a claim, the court accepts all of the factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). But the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or

unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## DISCUSSION

I.  **STANDING AND MOOTNESS**

    A.  **WDWGB Standing**

Defendants move to dismiss WDWGB's claims for lack of standing because there are no allegations, much less plausible facts, that WDWGB suffered any injury under either the state-created danger theories (brought as a due process claim under both 42 U.S.C. § 1983 and the California constitution) or under the ADA. On the state-created danger theories, defendants argue that because WDWGB did not itself reside at the Encampment and was itself not removed by defendants from the Encampment – and thereby placed in a position through defendants' acts that was more dangerous to it as an organization – it lacks standing to assert the state-created danger claims.[1] Defendants also contend that it was my orders, not the acts of the City, that forced plaintiffs to vacate the Encampment by a date certain and that, therefore, no plaintiff can allege injury through a state-created danger based on acts of the City. They also question WDWGB's standing to pursue the ADA claim because, as an organizational plaintiff, WDWGB is not itself "a qualified individual with a disability" protected by the ADA.

WDWGB alleges that it is "a 501(c)(3) organization made up of homeless and housing insecure individuals and advocates" whose mission is "to serve, support, and advocate for homeless individuals living in the East Bay." FAC ¶ 12. WDWGB's "main focus is to represent, support, and serve the four largest encampments along the I-80 corridor –in Berkeley and Emeryville, California," including the Shellmound Encampment; it "brings this suit on behalf of

---

[1] "State created danger" is a specific doctrine that creates an exception to the general rule that a "state's failure to protect an individual against private violence does not generally violate the guarantee of due process." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006); *Pauluk v. Savage*, 836 F.3d 1117, 1123–24 (9th Cir. 2016). "The state-created danger exception creates the potential for § 1983 liability where a state actor 'creates or exposes an individual to a danger which he or she would not have otherwise faced.'" *Campbell v. State of Washington Dep't of Soc. & Health Servs.*, 671 F.3d 837, 845 (9th Cir. 2011) (citation omitted). State-created danger arises when the state affirmatively exposes the plaintiff to a "known or obvious danger" and does so with "deliberate indifference." *Id*. at 845–846. Deliberate indifference requires that the state actor actually intend to expose the plaintiff to such risks without regard to the consequences. *Id*. at 846.

4

itself and on behalf of the homeless individuals it supported in the Shellmound encampment." *Id*. Plaintiffs state that as a result of being forced out of the Encampment, WDWGB "has been required to divert enormous resources to provide assistance to those residents" when they were displaced – initially from the Shellmound site but then from other sites they attempted to set up residences – and that WDWGB "had to assist them with packing and moving, providing tents, food, and a port-a-potty. During this time, [WDWGB] could not perform other tasks that were a part of its mission," and "[f]ollowing their third time being displaced in eight days and without a meaningful offer of accessible shelter by the" City, WDWGB "used its funds to pay for hotel rooms for" the individual plaintiffs for several weeks. *Id*. ¶¶ 48, 51-52.

An organizational plaintiff has standing if it alleges: (1) injury in fact; (2) causation; and (3) redressability. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). Injury can be established where the organization suffered "'both a diversion of its resources and a frustration of its mission'" but it "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all. . . . It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id*. at 1088 (citing *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir.2002)). In addition to the constitutional standing requirements, courts have erected "prudential barriers" and concluded that a "membership organization can sue in its representative capacity when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Presidio Golf Club v. Natl. Park Serv*., 155 F.3d 1153, 1159 (9th Cir. 1998) (quoting *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977)).

Here, WDWGB has adequately alleged a "diversion-of-resources" injury: but for the required spending of the resources to put plaintiffs up in hotel rooms, WDWGB would have allocated its resources elsewhere. It relies on *Natl. Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015), where the Ninth Circuit concluded that allegations that "Plaintiffs

1 expended additional resources that they would not otherwise have expended, and in ways that they
2 would not have expended them" were sufficient for standing. In that case, the court held that
3 while the plaintiff was traditionally engaged in voter registration efforts, because defendants were
4 failing to themselves provide voter registration services, plaintiff's allegations that it had to
5 expand its voter registration services to these other areas were sufficient to support a diversion-of-
6 resources injury. *Id*. at 1040.

7 Defendants argue that WDWGB's allegations are insufficient because it admits to
8 regularly providing services including "transportation, moving and packing services" to
9 encampments, and specifically to the Shellmound Encampment, FAC ¶ 18. The expenditures it
10 provided to the plaintiffs, according to defendants, cannot have caused WDWGB to divert funds
11 from its mission because they were simply part of its admitted mission. WDWGB alleges,
12 however, that it provided not only moving assistance (that it admittedly provides as part of its
13 mission) but also hotel expenses. *Id*. ¶ 51. There is no judicially noticeable evidence in the record
14 or allegations from plaintiffs that WDWGB typically provides hotel accommodations to "support"
15 the homeless. WDWGB has plausibly alleged a diversion-of-resources injury.

16 While defendants argue that there are no allegations that WDWGB would itself have
17 suffered an injury had it not provided the individual plaintiffs with hotel rooms and that doing so
18 was simply a "budgetary choice to re-allocate" funds, plaintiffs have plausibly alleged that they
19 had to divert funds to provide a service they contend defendants should have provided; but for
20 defendants' conduct, WDWGB would not have had to expend those funds. That is sufficient.
21 *See Cegavske*, 800 F.3d at 1040 (9th Cir. 2015) ("Resources Plaintiffs put toward registering
22 someone who would likely have been registered by the State, had it complied with the [law], are
23 resources they would have spent on some other aspect of their organizational purpose—such as
24 registering voters the [law's] provisions do not reach, increasing their voter education efforts, or
25 any other activity that advances their goals.").[2]

---

[2] This is not a situation where a plaintiff has merely diverted funds from one existing program to another existing program as a result of a defendant's conduct. *See, e.g., Fair Empl. Council of Greater Washington, Inc. v. BMC Mktg. Corp*., 28 F.3d 1268, 1276 (D.C. Cir. 1994) ("the diversion of resources to testing might well harm the Council's other programs, for money spent

6

Defendants also argue that because plaintiffs left the Encampment voluntarily – and defendants were not required to physically displace them – WDWGB cannot show that its injury flowed from the illegal conduct of defendants. *See, e.g., California v. Texas*, 141 S. Ct. 2104, 2113 (2021) ("A plaintiff has standing only if he can "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."). I will discuss this argument below with respect to defendants' claim that plaintiffs' first two causes of action are moot or fail to state a claim as a matter of law. But for purposes of standing, WDWGB has plausibly alleged injury to itself from the diversion of resources to pay for hotel rooms for the individual plaintiffs.

Finally, defendants challenge WDWGB's associational standing for two other reasons. First, they state that WDWGB has failed to plead that any of the plaintiffs or others impacted by the Shellmound Encampment closure are members of WDWGB and would have standing in their own right. That is true but could be readily corrected by amendment. Second, they assert that the relief here – presumably the provision of single-occupancy rooms for the individual plaintiffs given their mental health conditions – requires the participation of the individual members in this suit whose particular mental health issues are central to their claims, and that these individuals would need to prove up their individual damages sought in the suit. But these individuals are participating in this case as plaintiffs, so that factor is not a hurdle to associational standing.[3]

### B. Mootness of Individual Claims

Defendants argue that because the plaintiffs vacated the Shellmound Encampment – either voluntarily or as a result of my orders and not as the result of any physical acts of the defendants – the state-created danger claims are moot. They contend that plaintiffs' allegations demonstrate that their state-created danger claims are based exclusively on defendants' "clearing" of the Encampment. *See* FAC ¶¶ 61, 63 (alleging violation of the state-created danger doctrine "[b]y

---

on testing is money that is not spent on other things. But this particular harm is self-inflicted; it results not from any actions taken by BMC, but rather from the Council's own budgetary choices.").

[3] It is undisputed that the interests WDWBG seeks to protect through this suit are germane to WDWGB's purpose, satisfying the second prong of the association standing test.

7

clearing the homeless encampments in Emeryville Shellmound and failing to provide alternative, safe, accessible housing or a location where plaintiffs could safely reside, defendants have placed plaintiffs at risk that they will be cut off from the support they need to meet basic human needs for shelter, food, potable water, and hygiene facilities, defendants have affirmatively placed and continue to place plaintiffs in known or obvious danger."). They assert that it was my May 18, 2021 Order denying plaintiffs' request to remain at the Encampment that required plaintiffs to vacate by May 20, 2021 (although defendants state that plaintiffs did not vacate until May 26, 2021). Defendants also contend that I may judicially notice, pursuant to the impact of my prior orders, that the Shellmound Encampment has been cleared and closed and there is no reasonable expectation plaintiffs will be able to reoccupy it.

This argument carries no weight. It is undisputed that it was the defendants' decision to post a notice on April 15, 2021 at the Encampment notifying residents that they needed to remove themselves and their belongings by April 19, 2021 that led to plaintiffs' filing their request for a TRO, which I granted, securing plaintiffs' additional time before they had to vacate the Encampment. My orders denying plaintiffs' motion for a preliminary injunction and, after requiring the City to provide specific support services to the plaintiffs, setting a deadline by which plaintiffs had to be removed from the Encampment, and plaintiffs' conduct leaving the Encampment because no further relief from eviction would be provided, does not mean that plaintiffs' claims seeking damages for the City's conduct are moot. It was the City that began the process and ultimately secured the relief it sought. The individual plaintiffs' claims are not moot.

## II.     ADEQUACY OF PLEADINGS

### A.     Daniel

Defendants argue that Daniel, the City Manager, must be dismissed from the state-created danger claims (the only claims asserted against her). She is mentioned only twice in the FAC. Along with the City, she is alleged to have "evicted [plaintiffs] from their encampment without offering them a place where they could go that would accommodate their disabilities." (FAC ¶ 1) She was also "charged with executing the contract with Operation Dignity and with making any necessary non-fiscal changes to the program" but failed to "modify the program in any way to

8

allow for its accessibility to plaintiffs, and to require it to provide accessible shelter to people whom" Emeryville evicted from encampments. *Id*. ¶ 50.

Daniel has been sued in both her individual and official capacity. *Id*. ¶ 14. As to the official capacity, defendants argue Daniel is not only redundant of the City (and should be dismissed) but that there are also insufficient allegations of her participation in or failure to prevent the constitutional violations. In an official-capacity suit, the plaintiff must demonstrate that a policy or custom of the governmental entity of which the official is an agent was the moving force behind the violation. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Defendants argue that cannot be asserted here, where the court – upon application of plaintiffs – was the moving force that ultimately caused plaintiffs to vacate the Encampment.

As discussed above, however, it was the City's actions – posting the notice of eviction at the Encampment – that initiated the process and achieved the result the City sought – the clearing of the Encampment. Daniel, as the City Manager, is plausibly be alleged to be the moving force behind the City's determination to post the notice and start the process that led to the clearing of the Encampment. FAC ¶ 1 ("In May, defendants CITY OF EMERYVILLE and CHRISTINE DANIEL evicted them from their encampment without offering them a place where they could go that would accommodate their disabilities. As a result, plaintiffs remain homeless, without safe accessible shelter, scattered in various locations, and at risk of being evicted again.").

The official capacity claim could only make Daniel theoretically liable for injunctive relief. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n.24 (1997) (State officials sued in their official capacity for damages are not persons for purposes of § 1983). Plaintiffs do not request injunctive relief related to the state-created danger claims. Indeed, plaintiffs seem to admit the relief for these claims is *damages;* they only address their individual capacity claims against Daniel. Oppo. at 8-10. Therefore, the official capacity claim against Daniel is DISMISSED WITH PREJDUICE.

Turning to the state-created danger claims asserted against Daniel in her individual capacity, the FAC is devoid of allegations or facts regarding the acts she took in her individual

9

1 capacity. Plaintiffs assert that they have adequately alleged that "Defendant Daniel was charged
2 with modifying the City's program to make it accessible to persons with disabilities and that she
3 failed to do so. (FAC ¶ 50.)." Oppo. at 10. These bare assertions do not plausibly show that
4 Daniel took any act to directly place the plaintiffs in a situation of state-created-danger or that she
5 was deliberately indifferent to and thereby caused or failed to prevent others from acting to place
6 plaintiffs in a situation of state-created danger. *See, e.g., Starr v. Baca*, 652 F.3d 1202, 1205 (9th
7 Cir. 2011). Plaintiffs have not adequately alleged the state-created claims against Daniel in her
8 personal capacity. Normally, I would dismiss Daniel with leave to amend. As discussed below,
9 however, I conclude that plaintiffs cannot state the state-created danger claims as a matter of law
10 against either Daniel or the City.

### B. *Monell*

The defendants argue that plaintiffs fail to allege their *Monell* claim against the City because there are no allegations of a longstanding practice or custom by the defendants to subject homeless people to state-created dangers by closing encampments without providing adequate housing and services. To plead a *Monell* claim, a plaintiff must go beyond the respondeat superior theory of liability and demonstrate that the alleged constitutional deprivation was the product of a policy or custom of the local governmental unit, because municipal liability must rest on the actions of the municipality, and not the actions of the employees of the municipality. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). "A municipality is responsible for a constitutional violation, … , only when an 'action [taken] pursuant to [an] official municipal policy of some nature' caused the violation." *Castro v. Cty. of Los Angeles*, 797 F.3d 654, 670 (9th Cir. 2015) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).

Plaintiffs assert that their injuries stemmed from defendants' actions pursuant to the City's implementation of its homeless outreach policy, more specifically the failure of the City to implement "a homelessness program that offers accessible shelter to people with disabilities whom the City evicts from established encampments." FAC ¶ 28. The alleged failure of the City's program sufficiently alleges a *Monell* claim based on plaintiffs' injury from the City's adoption of a policy or program that does not provide adequate services. Plaintiffs need not allege

10

(as defendants contend) a longstanding practice of closing encampments without providing adequate shelter options for disabled homeless individuals.

### C. State-Created Danger Claims

Reiterating their mootness arguments, defendants contend that the individual plaintiffs cannot allege their state-created danger claims as a matter of law because while the City may have initiated process by posting notice of clearing the Encampment, I ordered plaintiffs to leave by a date certain and plaintiffs voluntarily departed the Encampment without further action by the City. That argument ignores that it was the City that initiated the process by posting the notice requiring the individuals to clear the Encampment and that the City secured the ultimate relief it sought (the Encampment was vacated and is now closed).

That said, I find that the state-created-danger theories fail because plaintiffs do not plausibly plead, nor can they plead given the record in this case, that defendants put them in a more dangerous situation than they had been in. Defendants ask me to take judicial notice of two sets of undisputed facts established by the record on the Temporary Restraining Order proceedings and adopted in my rulings. First, the City offered plaintiffs shelter beds at St. Vincent de Paul. Second, I allowed the Shellmound Encampment to be cleared because it was unsafe given its proximity to an active construction site. Defendants contend and I agree that the state-created danger claims – requiring plausible allegations that plaintiffs were placed in a more dangerous situation by the defendants – cannot be alleged as a matter of law given that a shelter bed is safer than an encampment abutting an active construction site.[4]

In opposition, plaintiffs argue – without citation or support – that I cannot consider the undisputed facts that plaintiffs were offered access to a shelter bed and that the Encampment was situated next to an active construction site. Oppo. at 14 n.4. They argue instead that because plaintiffs chose to move to other encampment sites (and were subsequently removed from two of those sites and settled at a third) that the City placed them in a more dangerous situation despite the fact that those sites were voluntarily chosen by the plaintiffs. Plaintiffs support that allegation

---

[4] Defendants also object to WDWGB's standing to pursue the state-created danger claims; that argument has been rejected.

11

by noting that in moving to the other sites they exacerbated their mental health impairments and that the sites were more dangerous because they lacked access to medical and sanitation services. Oppo. at 12. Plaintiffs ignore the uncontested fact that the City offered them a location that was physically safer and had sanitation facilities, the shelter bed at St. Vincent de Paul's.

That a congregate shelter setting might have exacerbated the plaintiffs' mental health impairments had any of the plaintiffs accepted the available shelter bed does not mean that the City placed plaintiffs in a more dangerous situation than living in an encampment next to an active construction site.[5] *See, e.g, Young v. City of Los Angeles*, CV2000709JFWRAO, 2020 WL 616363, at *7 (C.D. Cal. Feb. 10, 2020) (dismissing claim where despite allegation that plaintiff was forced to move from his encampment on numerous occasions, plaintiff failed to allege that the City's actions "exposed Plaintiff to a danger which he would not have otherwise faced if he were not forced to move" and recognizing "general complaints that the City is not doing enough to assist his social needs . . . are not sufficient to state a substantive due process claim as there is no affirmative right to governmental aid."); *Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 433 (N.D. Cal. 2017) (dismissing state-created danger/deliberate indifference claim where there were no "allegations of intentional eviction during precarious weather or other facts indicating deliberate indifference to the safety and welfare of the population" where plaintiffs were permitted to sleep in a City-owned lot or offered temporary emergency shelter); *but see Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079 (E.D. Cal. 2012) (plaintiff stated a cognizable substantive due process claim where the plaintiff alleged that the defendants timed demolitions of the plaintiff's shelter and property to occur at the onset of the winter months and knew or should reasonably have known

---

[5] In *LA All. for Human Rights v. City of Los Angeles*, LACV2002291DOCKESX, 2021 WL 1546235, at *42 (C.D. Cal. Apr. 20, 2021), the Hon. David O. Carter concluded that specific government policies (racially discriminatory policies, creation of a "containment zone" that deteriorated into Skid Row, and the government's "deliberate, political choice to pursue the development of long-term supportive housing at the expense of interim shelters to get people off the streets in the near-term") supported the state-created danger violation that justified the preliminary injunctions imposed there, including requiring Los Angeles County to provide access to "shelters" for residents of Skid Row. *Id.*, 2021 WL 1546235, at *62. The Ninth Circuit subsequently reversed the injunctions and remanded the case for further proceedings, *LA All. for Human Rights v. County of Los Angeles*, 14 F.4th 947 (9th Cir. 2021). There are no comparable allegations here. As noted and undisputed, shelter beds have been made available to plaintiffs in congregate settings.

1    that their conduct threatened the plaintiff's continued survival).  Plaintiffs chose to live in

2    encampments without medical services or sanitation facilities rather than the shelter.  *See Cobine*

3    *v. City of Eureka*, 250 F. Supp. 3d 423, 433 (N.D. Cal. 2017) ("in the absence of particular

4    allegations that the state action put the Plaintiffs in an inherently dangerous situation, the Court is

5    bound to find that the generalized dangers of living on the street preexisted Plaintiffs' relocation"

6    from a cleared encampment to a parking lot.).

7    Based on the judicially noticed and undisputed facts that were incorporated into my orders

8    in this case, plaintiffs cannot state a state-created danger theory under Section 1983 or the

9    California Constitution.

### D.  ADA Claim

"To state a claim under Title II of the ADA, a plaintiff generally must show: (1) she is an individual with a disability; (2) she is otherwise qualified to participate in or receive the benefit of a public entity's services, programs or activities; (3) she was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of her disability."  *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part, cert. dismissed in part sub nom. City and County of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015).

Defendants argue that WDWGB cannot allege standing as an organization and the individuals have failed to adequately allege that they have been excluded or denied from the City's program and that the exclusion was by reason of their mental health disabilities, the third and fourth elements of a Title II claim.  As discussed above, WDWGB has adequately alleged an injury to itself sufficient to confer standing.  Defendants cite no authority that an organization cannot bring a Title II claim based on its own injury or based on injury of its members.  But as noted above, WDWGB has not alleged that the plaintiffs were members, which would confer organizational standing.  WDWGB is given leave to amend to cure that defect.

The individual plaintiffs contend that they have adequately alleged exclusion by reason of their disability because the fundamental purpose of the City's outreach program through Operation

Dignity (the "Program") is to serve and house homeless residents. They have specifically alleged that:

> 29. Further, the City and its contractor do not operate the City's homelessness program in a way that is accessible to people with disabilities. As a result, people with severe mental and physical disabilities suffer outright exclusion from the program or are denied equal access to the benefits of the program, including case management, services, and permanent housing that appropriately accommodate their disabilities.
>
> 30. The CITY OF EMERYVILLE is aware that Mr. REED, Ms. BERRY, Mr. MOORE, and Mr. SMITHSON are disabled and has failed to make reasonable modifications to the program it developed and operates using Operation Dignity.
>
> . . .
>
> 36. The CITY OF EMERYVILLE's homelessness outreach program is also run in an inaccessible manner and in a way that denies plaintiffs with disabilities equal access to the program. Mr. REED, Ms. BERRY, Mr. MOORE, and Mr. SMITHSON's mental health disabilities impact their ability to think in an organized fashion, interfere with their ability to remember appointments, increase their anxiety during the completion of typical tasks, and require that persons working with them take additional time and operate with patience. Operation Dignity places the burden on plaintiffs to complete tasks they are unable to accomplish, because of their disabilities, and does not provide them the support they need.
>
> 37. Operation Dignity does not provide any kind of appointment reminder to plaintiffs for the appointments that it sets and repeatedly fails to keep appointments that it makes with plaintiffs. This failure erodes each plaintiff's ability to communicate with and cooperate with the organization. As a result, appointments do not regularly occur resulting in the plaintiffs not receiving the services to which they are entitled.

FAC. In their opposition, plaintiffs identify the disparate impact and exclusion from the City's program as their inability to access "the benefits of the program because the only alternative shelter offered to them is inaccessible and the services provided by the outreach workers are inaccessible." Oppo. at 16.

The Title II claim cannot be based on allegations that given their particular mental health disabilities, plaintiffs needed *more* support or *additional* services from the Program that are not provided to other homeless people, *e.g.*, appointment reminders or additional appointment services not provided to any homeless persons. *See* Oppo. at 11 (alleging Operation Dignity "does not provide additional time to complete tasks, does not provide reminders of appointment, and

14

repeatedly fails to keep appointments" (citing FAC ¶¶ 36-37)). The Supreme Court in *Alexander v. Choate*, 469 U.S. 287 (1985) held that Title II was not violated where a policy is "neutral on its face, is not alleged to rest on a discriminatory motive, and does not deny the handicapped access to or exclude them from the particular package of" services (at issue in Alexander, Medicaid services). *Id*. at 309. Because "[t]he State has made the same benefit – 14 days of coverage – equally accessible to both handicapped and nonhandicapped persons, [] the State is not required to assure the handicapped 'adequate health care' by providing them with more coverage than the nonhandicapped." *Id*. The Court recognized that "[t]he benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Id*. at 301.

Here the benefit, as alleged by plaintiffs, is the "homeless strategy program" to "serve and house homeless residents" that – as operated through Operation Dignity – includes "Rapid Rehousing, Emerging Needs Fund and outreach services including access to St. Vincent de Paul shelter beds for homeless individuals." FAC ¶¶ 22-23, 27; *see also id*. ¶ 29 ("the City and its contractor do not operate the City's homelessness program in a way that is accessible to people with disabilities. As a result, people with severe mental and physical disabilities suffer outright exclusion from the program or are denied equal access to the benefits of the program, including case management, services, and permanent housing that appropriately accommodate their disabilities."). These are neutral policies with neutral benefits provided to all homeless individuals. What plaintiffs complain about is the failure of the City through its Program to provide additional services (*e.g*., single room shelter beds, more frequent appointment reminders, additional time to complete tasks). The failure to provide additional services, however, is not a denial of a benefit under Title II.

Plaintiffs rely on *Smith v. City of Oakland*, 19-CV-05398-JST, 2020 WL 2517857 (N.D. Cal. Apr. 2, 2020). There, plaintiffs alleged that the policy/benefit at issue – the provision of rent control on units of housing built before 1983 – excluded disabled residents from the program because units built prior to 1983 were not required to comply with accessibility standards. *Id*. *7-

15

8. As a direct result, the defendants' choice to limit rent control protections to units built before 1983 created a "benefit" that it "is constructed 'in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled.'" *Id*. at *8 (quoting *Alexander*, 469 U.S. at 301). No similar allegations are made here. Plaintiffs do not argue that the Program is structured – unlike in *Smith* – to "effectively deny" homeless individuals with mental health disabilities access to the services provided by Operation Dignity as a result of their mental health disabilities.

But plaintiffs also contend that they have adequately pleaded a second type of Title II ADA claim: The City failed to make reasonable accommodations to its program to make it accessible to disabled people as required by the ADA's implementing regulation, 28 C.F.R. § 35.130(b)(7)(i). Under that regulation, "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *See McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004) ("[A] claim of discrimination based on a failure reasonably to accommodate is distinct from a claim of discrimination based on disparate impact.") (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276-77 (2d Cir. 2003)); *Smith v. City of Oakland*, 19-CV-05398-JST, 2020 WL 2517857, at *6 (N.D. Cal. Apr. 2, 2020) ("The Court first notes that Plaintiffs make two ADA-based claims, though they label them as a single cause of action, [] (1) violation of Title II of the ADA, 42 U.S.C. § 12132, and (2) a failure to make reasonable modifications as required by the ADA's implementing regulations, 28 C.F.R. § 35.130(b)(7)(i).").

The ADA does not require public entities to fundamentally alter the nature of the service they provide in order to accommodate people with disabilities. *Tennessee v. Lane*, 541 U.S. 509, 532 (2004). An alteration is fundamental if it would alter "the essential nature" of the program. *Alexander v. Choate*, 469 U.S. 287, 300 (1985). In particular, "public entities are not required to create new programs that provide heretofore unprovided services to assist disabled persons." *Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir.2003).

16

Plaintiffs argue that the City could readily provide reasonable accommodations to the way it provides services through the Program to serve homeless residents with mental health issues like plaintiffs without fundamentally altering the Program, such as providing shelter options that include single rooms, appointment reminders, and accountability from outreach staff. Oppo. at 17. Plaintiffs also note that the determination of what possible accommodations are reasonable and would not "fundamentally alter" the nature of the services provided by Operation Dignity is highly-fact specific and cannot be resolved at the motion to dismiss stage. *See Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996) ("we have held that the determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry.").

I agree that the question of reasonable accommodation cannot be determined at this juncture. For example, while provision of single-bed shelter rooms might (on a factual record) be a fundamental alteration of the City's program that is not required, provision of quieter spaces or areas otherwise separated from the larger congregate setting within an existing shelter arrangement might be a reasonable accommodation. I cannot make that determination based on the pleadings alone.

Defendants' argument that it cannot be held liable under the ADA for failure to provide reasonable accommodations in its services because it contracts out the provision of its homeless services to others (*e.g.*, Operation Dignity or St. Vincent de Paul's) is, on this record, without support. Defendants fail to cite any case arising under the ADA to buttress such a defense. Absent apposite cases or identification of specific provisions in the ADA or in its implementing regulations, I will not accept that the City has no responsibility to ensure that its provision of homeless services complies with the ADA's mandates, whether or not it contracts with service providers for such services.

## CONCLUSION

Defendants' motion to dismiss is GRANTED with respect to defendant Daniel and the state-created danger claims. Defendants' motion is DENIED with respect to the individuals' ADA claim and granted with leave to amend with respect to WDWGB's associational standing under the ADA.

17

1    Plaintiffs shall file an amended complaint addressing the defects in WDWGB's associational standing allegations within twenty (20) days of the date of this Order.

A Case Management Conference is set for December 7, 2021 at 2 p.m.  The Joint Case Management Statement is due November 30, 2021.  I intend to set the case schedule at the conference.

**IT IS SO ORDERED.**

Dated: October 26, 2021



William H. Orrick
United States District Judge